FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

2023 DEC -8 P 12:36

Dr. John Patrick Moran, PRO SE
6471 Bold Venture Trail
Tallahassee, FL, 32309

1:23 cv 1681
PTG-LRV

     Plaintiff,

v.

Lloyd Austin, in his official capacity as Secretary of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Retired Admiral Michelle Howard, in her official capacity as Chair of The Naming Commission
1000 Defense Pentagon
Washington, D.C. 20301-1000

Christine Wormuth, in her official capacity as Secretary of the Army
101 Army Pentagon
Washington, DC 20310-0101

Karen Durham-Aguilera, in her official capacity as Executive Director of the Office of Army
Cemeteries (Army National Military Cemeteries, ANMC)
1 Memorial Avenue
Fort Myer, Virginia 22211

     Defendants.

# COMPLAINT

1. This complaint alleges that senior officials at the Department of Defense have violated the

William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, the

National Environmental Policy Act, and the First and Fourteenth Amendment in their plans to

imminently remove the Confederate Memorial from Arlington National Cemetery. This

complaint asks the Court to issue preliminary and permanent injunctions barring the Army and

1

Department of Defense from removing any element of the Confederate Memorial from Arlington.

2. Jurisdiction: This complaint regarding federal laws is against federal officials regarding their planned imminent action in Arlington National Cemetery in Arlington County, which is within the boundaries of the Eastern District of Virginia. At least four of the officials have offices in Eastern Virginia.

3. The plaintiff is the great-great-great grandson of a Confederate prisoner of war, Charles ("Chas") Derrick, a private in the Georgia Cavalry who was not an enslaver. Chas's wartime death at Camp Douglas at age 30 under conditions of forced starvation, untreated illnesses, and inadequate winter shelter left behind a five-year-old son in Georgia whose granddaughter, Ruth, became the plaintiff's grandmother. Chas's wartime death is memorialized by the Confederate Memorial in Arlington National Cemetery, alongside the wartime deaths of another estimated 250,000 Americans who served in their respective states' regiments during the Civil War.

4. The plaintiff's ancestor Chas Derrick is interred in Illinois in this hemisphere's largest documented mass grave. Chas's shared headstone in Illinois is topped by a statue of a Confederate soldier. That grave marking shares design features with the Confederate Memorial in Arlington, including a figurative statue atop a pedestal, a 360-degree design that mixes visual representation and text, the inscribed names of the interred positioned at four cardinal sides, and a location within a cemetery. Its fate is inextricably linked with that of the Confederate Memorial

in Arlington, reliant on nationally shared cultural norms regarding respect for the integrity of cemetery features.

5. The plaintiff's ancestor's grave marking, which is under the jurisdiction of the Department of Veterans Affairs, will be imminently imperiled by the Department of Defense's proposed action to remove visually and functionally similar cemetery elements at the Confederate Memorial at Arlington. This action at the nation's most hallowed cemetery will set precedent for the speedy removal of cemetery elements from Confederate graveyards nationally. In a September 13th, 2023 article "As Confederate Monuments Topple, Some at VA Cemeteries Still Loom Large" by Howard and Kehrt on *The War Horse*, the authors write, "This past March, in a carefully worded statement, Arlington National Cemetery announced it would remove its Confederate memorial, a 32-foot-tall bronze-and-granite statue honoring the Confederate dead, which had stood for more than a century among the graves of Confederate soldiers buried there." In this context of the Arlington removal, the article questions the continued existence of the plaintiff's ancestor's grave marker: "And in Chicago, not far from where thousands of Confederate soldiers died at Camp Douglas, their remains are marked by a 40-foot-tall statue of a Confederate soldier who peers out above the graves of prominent Black leaders buried in the adjoining cemetery." A VA spokesperson pressed by the authors responds: "We are considering all of our options."

6. The Department of the Army plans to remove what have been termed the "bronze elements" of the Confederate Memorial in Section 16 of Arlington National Cemetery on January 1st, 2024, catalog them, and place them in storage, while leaving the granite base on site (the rest of this complaint will use the language "remove the Memorial" rather than "remove the bronze

3

elements"). The lead agency for this action is Army National Military Cemeteries (ANMC) (Office of Military Cemeteries), whose Executive Director is Karen Durham-Aguilera; ANMC is an office in the Department of the Army, led by Secretary Christine Wormuth. The date of the planned action is a deadline mandated by the "William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021," which directed the Secretary of Defense, Lloyd Austin, to establish The Commission on the Naming of Items of the Department of Defense that Commemorate the Confederate States of America or Any Person Who Served Voluntarily with the Confederate States of America (the "Naming Commission," chaired by Admiral Michelle Howard). In its Final Report to Congress in 2022, the Naming Commission recommended the removal and disposal of the "bronze elements" of the Confederate Memorial, preferably while retaining the granite base on site. Secretary Austin issued a memorandum accepting all the Naming Commission's recommendations, ordering all Departments including the Department of the Army to carry out those recommendations.

7. The Confederate Memorial is a 32-foot-tall bronze sculpture in the center of Section 16 of Arlington National Cemetery, a Section where over 480 Confederate veterans and spouses are interred in a distinctive circular formation, as allowed by legislation in 1900, following President McKinley's recognition of the service of Confederate veterans in the Spanish-American War. The Memorial, dedicated to the Confederate Dead, is the work of sculptor Moses Ezekiel, was funded and erected by the United Daughters of the Confederacy with the permission of Secretary of War William Howard Taft, and was dedicated in 1914; Ezekiel was later buried at the foot of the Memorial alongside three others.

8. Ezekiel's neoclassical sculpture contains dozens of human and allegorical figures swept up in the drama of war, four major inscriptions, themes of duty, valor, and mourning, and is uniquely known and criticized for including figural depictions of two enslaved Black Americans: a woman holding the white daughter of her enslaver and a man in a Confederate uniform presumed to be following his enslaver into war, an extremely uncommon occurrence. The sculpture, Ezekiel's largest and most complex work, could be described for dozens of pages.

9. The Memorial is frequently and unofficially called the "Reconciliation Memorial" because its allowance was framed as an act of generosity on behalf of Republican politicians and members of the Grand Army of the Republic veterans' organization; and because the theme was a major focus of speeches by Presidents McKinley, Taft, Wilson, and Coolidge. This interpretation is not accepted by some critics who consider the Memorial a Trojan horse for the Lost Cause. "The story that this Confederate Memorial is about reconciliation is a story that was created to further racial injustice," said Dr. Allison Finkelstein, Arlington National Cemetery Senior Historian, at the August 11th, 2023 Advisory Committee on Arlington National Cemetery Remember & Explore Subcommittee Meeting.

10. The planned action at Arlington, to remove the "bronze elements" that constitute the Memorial and leave behind the emptied granite base, will also leave behind a sign of the state's moral censure at the cemetery site that serves as the official national memorial of the death of the plaintiff's great-great-great grandfather. Section 16 was an invitation by President McKinley and Congress extended to the survivors and descendants of Confederate veterans to have a dedicated resting place in Arlington for the Confederate dead. The Army's plan to follow the Naming

Commission's discretionary preference to maintain the granite base of the Memorial at the site will serve as a glaring visual reminder of the state's physical desecration of Section 16.

11. The Memorial is an object with a religious valence, cemetery statuary placed in the center of a graveyard in an American and Judeo-Christian burial tradition. This religious element is deeply tied to the historic nature of Arlington as a cemetery where among the most sacred of religious practices occur and where soldiers' graves may be marked with religious iconography.

12. ANMC's listing of adverse effects from the removal of the Confederate Memorial (DHR File No 2022-0201, the Section 106 process submission on the revised Area of Potential Impacts as regards NRHP) failed to address the fact that the Memorial's historic location is specifically an historic cemetery. As cemetery statuary, much of the Memorial's historic significance is related to its specific character and continuous function as a cemetery feature. There are specific types of engagement with history that often happen in cemeteries, related to processes of mourning, memorializing, and remembering the lives of the dead.

13. The imminent government action to remove the Memorial while retaining the granite base on site intervenes in the core experience of the Section 16 cemetery between visitors including the plaintiff and the representative interred ancestors that he and they seek to memorialize, mourn, and prayerfully contemplate the deaths of and pray to a deity for their afterlives in a Judeo-Christian tradition. Rather than a memorial which facilitates the visitor's experiences of mourning, memorialization, commemoration, and grieving, the state's ominous on-site retention of the base will serve as an ever-present mark of shame reminding of the state's show of physical

force. This conspicuous, indeed highlighted absence will loom over the plaintiff and those that seek to memorialize their ancestors. The ominous base will be a stark symbol of the state's power to shame, erase, and coerce, even in the most sacred and inviolable of spaces; indeed, a literal erasure of human figuration from a religious site; and promote doubt as to the moral legitimacy of those who memorialize or mourn their ancestors in Section 16. Casting an explicit visible sign of material stigma over a graveyard of the dead—fallen Confederate soldiers or not—psychologically intrudes upon and chills the religious use of the Section 16 graveyard and memorial site for those with an interest in using it. The empty base will intrude upon the fundamental and deeply universal right to observe one's family members resting in peace. Indeed, Section 16 will have no such peace; for the state seeks war upon the dead. There is rarely a more convenient Internal Enemy for a state than those whose lips are sealed by time. The dead cannot rise from under the care of those who theatrically scorn them and rebury themselves in a cemetery that does not wish them to die a second time.

14. This imminent action will betray the very compact that built the graveyard in Section 16. The remains will be fixed in the shadow of an insidious political theater and become a physical site entirely incongruous with the nature and function of a cemetery. Internment is permanent except in the most extreme of circumstances. But at a facility of the importance and sophistication of Arlington—internment is a pact. Arlington says itself that it maintains the highest standards of care. The Army takes remains with whose care they were entrusted—through the efforts of multiple Presidents from Lincoln's party—and betrays that moral pact with profound religious implications. This removal repeats and echoes the state's pattern of denial of equal treatment and fair dealing for the survivors and ancestors of the Confederate dead

from before the creation of Section 16, who at least for a period in the 1870s were denied the right to decorate their loved ones' graves. It denies a memorial that has stood in "the nation's cemetery" for a century while keeping all other memorials in place. The global history of targeted state removals of cemetery elements serves as a stark warning regarding such actions. The plaintiff, a cultural anthropologist who once trained as a Sinologist, is acutely aware of the historical implications of such symbolism. The interventions at the Cemetery of Confucius in Qufu in 1966, similarly completed in the name of rectifying historical wrongs, chilled speech, intimidated political opponents, and fomented severe emotional distress by targeting an intimate and protected sacred freedom: the religious practice of worshipping, praying for, remembering, and memorializing one's ancestors. Archaeological work at the National Memorial Museum of Victims of Occupation Regimes (the Lontshoko Prison Museum) in Lviv, Poland in 2020 revealed that during Nazi and/or Soviet occupation, headstones from the Old Jewish Cemetery in Lviv were used to pave the prison courtyard. Now that they are in the process of being returned to the Old Jewish Cemetery in Lviv.

15. This visible desecration will also be acute for the plaintiff as an openly gay man raised in the Deep South who will lose a singularly unique, culturally and religiously object sculpted by a Confederate veteran who lived in a long-term same-sex relationship.

16. The literal severing into two parts of the Confederate Memorial in Arlington, leaving only the granite base in the cemetery as a mark of shame, as an ever-present reminder of the state's action and the state's scorn upon the interred and memorialized, is offensive in the Christian burial tradition that the plaintiff was raised to observe as a Roman Catholic and which the

plaintiff still observes and participates in for any actor including the state to disturb and remove cemetery elements. It will disrupt the plaintiff's ability to peacefully memorialize his young ancestor's sacrifice of life at the sacred national site created for that very purpose. In fact, even if the base was removed with the memorial, the memorial is so integral to the design of Section 16 that the empty middle patch in the circle bizarrely surrounded by four internments would also result in an obviously disturbed cemetery. The veneration of iconography within Catholicism places emphasis on the integrity of statuary and other religious imagery and the integrity of sacred sites; their destruction is not a matter of redecorating. In 2021, at a time when statues of figures undergoing revisionist criticism such as St. Junipero Serra were vandalized, the United States Conference of Catholic Bishops wrote to Congress about the increasing destruction of Catholic statuary. "It is difficult not to regard the destruction of these statues as an attack on our faith," the Archbishops explained. It is especially sacrilegious to disturb and destroy cemetery elements and then leave, in material form, a sign that passes Judgement and ill regard upon those resting. When the government visibly alters the character of Section 16 in Arlington for the purpose of a political expression that shames the deceased with a permanent mark of material scorn, it will intervene in, disrupt, and antagonize the plaintiff's free exercise of religion at one of the most holy, intimate, and serene sites, held as universally sacred by most faiths.

17. Congress did not authorize the removal of Arlington's Confederate Memorial. The Naming Commission formed by Secretary Lloyd Austin and Chaired by Admiral Michelle Howard exceeded its statutory authority and violated the express language of Congress by recommending the removal of Arlington's Confederate Memorial. SEC 370 of the "William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021" charged the Secretary of

Defense with implementing a commission to "remove all names, symbols, displays, monuments, and paraphernalia that honor or commemorate the Confederate States of America (commonly referred to as the ''Confederacy'') or any person who served voluntarily with the Confederate States of America from all assets of the Department of Defense."

18. The Confederate Memorial does not honor or commemorate the "Confederate States of America." As President Wilson spoke at the Cemetery in 1914, "The Daughters of the Confederacy have presented a memorial of their dead to the Government of the United States." A memorial to the Confederate Dead is quite distinct from a monument to the Confederate States of America—a distinction abundantly clear in the historical record. "You are not here to mourn or support a cause," President Taft spoke in 1906. The phrase "Confederate dead" as the object of dedication and remembrance appears dozens of times in the record of the dedication ceremony by Hilary Herbert available at battlefields.org.

19. The evolving distinction between memorial and monument (both terms were used to describe the Confederate Memorial in Arlington during its creation; monument more frequently), while not fixed in meaning, is still significant. A memorial memorializes—preserves the memory of, and/or honors—the dead and their untimely death, while monuments honor and commemorate lives and events, but are not focused on loss, and are more likely to be a non-figural edifice (see The Inclusive Historian's Handbook, "Memorials and Monuments," July 18, 2019; and "Monument vs. Memorial: What's the Difference?" The Arizona Republic, October 20th, 2018, for common shared definitions). A memorial's association with loss and death, especially the assassinated and those dead on the battlefield, provides memorials a distinct and more solemn

moral valence from monuments. No one would mistake the spirit of the Vietnam Veterans Memorial for that of a ticker tape parade; and while the Lincoln Memorial and Statue of Liberty National Monument are both cherished, the Memorial is more solemn. The Confederate Memorial has long been consistently referred to as a memorial in line with the other memorials in Arlington National Cemetery.

20. The second criteria for removal in SEC 370, to "remove all names, symbols, displays, monuments, and paraphernalia that honor or commemorate... any person who served voluntarily with the Confederate States of America" also does not include the Confederate Memorial in Arlington. The Confederate Memorial in Arlington does not honor or commemorate any person—it is not a base named for a general, for example, which was the central focus of the Naming Commission, so named. Rather, it memorializes the deaths of all Confederate soldiers who fell during the war. This includes both voluntary and non-voluntary conscripted soldiers— an estimated over 250,000 deaths.  The intentional inclusion of the language "any person who served voluntarily" by Congress makes rather plain that persons whose service was non-voluntary are excluded.

21. As Senator Webb wrote in *The Wall Street Journal* on August 18th, 2023: "Having spent four years as a full committee counsel in the House and six years as a member of the Senate Armed Services Committee, I cannot imagine that the removal of this memorial, conceived and built with the sole purpose of healing the wounds of the Civil War and restoring national harmony, could be within the intent of a sweeping sentence placed inside a nearly trillion-dollar piece of legislation."

22. Senator Webb cannot imagine that the removal was within the intent of that sentence because it was not.

23. Indeed, if Congress intended to use that legislation to remove the Confederate Memorial, which has distinctly and consistently been called a memorial for decades, from Arlington National Cemetery (ANC), in arguably the most historically consequential long-term planned action to come out of the entire Naming Commission, Congress would have almost certainly included "memorial" in its list of "names, symbols, displays, monuments, and paraphernalia."

24. Not only is the text of SEC 370 itself plain and unambiguous, but an attempt to elicit the meaning of that statutory language using the historical record at the time of its passage makes even more clear that SEC 370 was never understood as authorizing the removal of Arlington's Confederate Memorial.

25. On June 30, 2020, Senator Warren gave her floor speech in support of the amendment authorizing the Naming Commission: "The defense bill now before us includes language I wrote that would require the Secretary of Defense to remove Confederate names from all military assets… This bill covers more than military bases. It also requires name changes for federal buildings and streets on those military bases and at other installations that celebrate the traitors who took up arms against the United States to defend slavery." Warren's speech never mentions memorials, cemeteries, graveyards, nor Arlington National Cemetery; only once, in the third-to-

last sentence, are the words "symbols, displays, monuments, and paraphernalia" included.
Conversely the words "named" "names" and "name" are mentioned 36 times.

26. When President Trump vetoed the bill, his press release mentioned only base name changes.
Similarly, NPR made no mention of actions other than renaming, reporting: "If the authorization
becomes law, 10 Army bases named after prominent Confederate military leaders would be
changed. They include Fort Bragg in North Carolina, Fort Hood in Texas and Fort Benning in
Georgia. Other military installations that bear the names of Confederate figures would also be
changed" (Neumann, 7/20/20). The Associated Press included more detail: "Exceptions are also
made for grave markers, all but ensuring no disruptions at Arlington National Cemetery, aides
[for Chairman Inhofe] said." A bill presented clearly as a grandmother that, only after passage, is
revealed to be a wolf in grandmother's clothes, has little reason to complain if it is later
interpreted as indeed having the textual surface of a charming if musty nightgown. Indeed, the
grandmother's disguise has remained consistent: After the Third Report recommending the
removal of Arlington's Confederate Memorial to Congress was released, and the DOD released a
short press release on the beginning of implementing the Commission's recommendations, the
DOD News article on the topic, "DOD Begins Implementing Naming Commission
Recommendations" (Garamone, 1/5/23), contributed one paragraph regarding each individual
base being renamed, but once again, did not mention the Confederate Memorial in Arlington.
Relying on the DOD's media and news offices, one would not even know the Memorial was
slated for removal. It is quite an impressive feat for the removal of a 32-foot-tall Memorial in the
nation's most hallowed ground which memorializes 250,000 dead to go without mention during

not just the passage of the law that allegedly authorized its removal but also the state

announcements and reports of that same law's implementation.

27. Furthermore, the Naming Commission was tasked with defining a grave marking since

removing grave markings was expressly prohibited by Congress in SEC 370. The Naming

Commission's definition of a grave marking is found on page 10 of the Commission's Final

Report to Congress: "The Commission defined grave markers as: Markers located at the remains

of the fallen. A marker, headstone, foot stone, niche cover, or flat marker containing inscriptions

commemorating one or more decedents interred at that location. This definition is in line with the

existing 38 U.S. Code § 3706 – Headstones, markers, and burial receptacles."

28. Arlington's Confederate Memorial is located at the remains of the fallen so much so the fact

that the Commission doubted the base could even be safely removed without disturbing graves;

the Army's explanation for its plan to not remove the granite base is to avoid disturbing the

remains of the sculptor Moses Ezekiel and three others buried directly in the Memorial's

shadow. The Memorial contains inscriptions commemorating/memorializing their deaths and all

those interred in a circular formation around the memorial. The Naming Commission did not

define marker to preclude sculptural elements or to be limited to a certain size or form. The

Memorial meets the Commission's own definition of a grave marker to the letter, and such grave

markers are expressly exempt.

29. The Naming Commission was tasking with carrying out SEC 370 (c)(2): "develop

procedures and criteria to assess whether an existing name, symbol, monument, display, or

paraphernalia commemorates the Confederate States of America or person who served voluntarily with the Confederate States of America." The Report lists nine "Removal criteria" determined by the Commission, including, "Asset is designated as one that honors or commemorates the Confederacy or a person who served voluntarily with the Confederacy" and "Asset is not a grave marker." However, the Naming Commission's Final Report does not make clear what procedures and criteria were used to assess whether or not an existing asset falls into the category of "asset is designated as one that honors or commemorates the Confederacy or a person who served voluntarily with the Confederacy."

30. Page 5 of the Report indicates that the Services, which would include the Department of the Army led by Secretery Wormuth, "were tasked to inventory their assets according to those criteria. The responses included a list of all Confederacy-affiliated assets and associated costs for renaming or removal." The Report also states that Arlington National Cemetery provided a briefing to the Naming Commission in April 2021. The Report also states the Army Support Team "captured thousands of Confederacy-affiliated assets" for an inventory.

31. "Confederate-affiliated asset" and an asset meeting the Commission's own Criteria for Removal are overlapping but not isomorphic categories. Some assets fall into the category of "Confederate-affiliated asset" but not into the category of assets that meet the specific Removal Criteria. The Naming Commission had a statutory obligation under SEC 370 (c)(2) to "develop procedures and criteria to assess" what assets belonging in the latter category of meeting the Criteria for Removal. The Naming Commission did develop this "criteria to assess"—it is plainly listed in the Naming Commission's Final Report.

32. The "procedures to assess" are a different matter. Obligation to "develop procedures and criteria to assess" implies more than simply inventorying, then deciding; it asks for procedural decision-making and itself alludes to due process. Yet that the Commission found the Confederate Memorial's removal as within its remit is explained in the Final Report with only one sentence: "The Commission finds the Confederate Memorial located at Arlington National Cemetery is within its remit" (page 15). The next sentence begins the description of the Memorial. This sentence, which performs its task to the absolute minimum degree while providing no useful explanatory information, points to a lack of procedural decision making. There is no indication of deliberation; complication; evidence; argument; justification; examination of the specific letter of Congress's authorization; or even documentation.

33. If true procedural care had been taken to determine if the asset fell within the remit, a reasonable understanding of the asset would likely be demonstrated. Yet the Naming Commission and the ANMC's mischaracterizations and misrepresentations of the Confederate Memorial, through glaring omissions and assertions unsupported by the physical and historical record, are a scholarly failure suggestive of processual failure. Through these facile descriptions, the Memorial was made to "fit" the requirements of SEC 370. However, while these descriptions may align perfectly with statutory desires, they do not align with the statue's bronze.

34. The sculptural elements and inscriptions on the Memorial are fixed in metal. Yet the Naming Commission's Final Report's description of the Memorial did not describe these Memorial's elements as they actually exist (the Report is widely available including from the Federal

16

Depository Library Program at https://permanent.fdlp.gov/gpo189897/index.htm). It does not even include a photograph of the full profile of the Memorial, but rather only a detail of the frieze, despite being the official Report recommending this significant Memorial's removal, after over 100 years' existence, from a hallowed National Historic District. The Naming Commission Final Report to Congress, Part III: Remaining Department of Defense Asset's description of the female figure atop the Memorial (page 15) is: "Standing on a pedestal, a bronze, classical female figure, crowned with olive leaves, represents the American South." The Report includes a clause that mentions the figure is crowned with olive leaves, but does not mention the figure is also holding a wreath outward to place before the graves of the dead, despite this being the most visually prominent feature of the figure—a larger and more prominent wreath than the crown atop the head—and obviously key to the figure's symbolic meaning of mourning the dead. This information was available in the Virginia Department of Historic Resources Architectural Survey Form (DHR ID: 000-1235), from an entry in May 2012: "Crowned with olive leaves, her left hand extends a laurel wreath southward in acknowledgment of the sacrifice of those who died in the war."

35. Similarly, the Report's description of the figure, despite taking time to mention the crown of olive leaves, does not mention the ploughshare in the statue's right hand, an illusion to the prominent inscription from Isaiah on the Memorial: "They shall beat their swords into ploughshares." This unmistakable reference to reconciliation, which like the unmistakable reference to mourning, does not fit the Department of Defense's master narrative, is simply not included, unlike the quotation favorable to the Department's narrative, "'Victrix causa diis placuit sed victa Caton' – which means, 'The victorious cause was pleasing to the gods, but the

lost cause to Cato'" (Final Report, page 15). The Isaiah quote is similarly alluded to in the name of Swords into Ploughshares, the organization that recently melted down a statue of Robert E. Lee from Charlottesville; if such an allusion was consistent with the perpetuation of the Lost Cause it is very unlikely to have been adopted by that group.

36. Just as the Naming Commission omitted description of literal features of the Memorial that did not serve its narrative, it failed to fairly describe the Memorial's symbolism. The Commission's language in the Report and other reports by the Army such as the Phase II Cultural Resource Survey were used by journalists to extrapolate the Memorial's symbolic meaning. As Fieseler wrote in the *Post and Courier* (9/4/23): "Standing in Arlington, one sees a bronze goddess representing the glories of the South towering over bronze vignettes." It is not hard to extrapolate this "glories" from the Commission's mentioning of the figure "crowned with olive leaves" while omitting the features that allude to mourning and reconciliation. However, the figure representing the South is not being commemorated or honored; indeed, she is depicted laying a wreath on graves. Olive branches, indisputably a symbol of peace, here form a wreath, a rich and complex classical allusion, including association with the ancient Olympic games— during those games, civil wars between Greek states abated. The wreath is also a symbol of mourning, as in Ovid's patriarchal recounting of a grieving Apollo wearing a laurel wreath symbolizing his yearning for the lost Daphne. Like many other states, the Ohio Civil War Medal produced in 1866 shows a figure of Liberty wearing a wreath while also placing another wreath atop a veteran's head with the words, "The State of Ohio to Veteran Ohio Volunteer." In the background, there is a bundle of wheat, an allusion shared by the references to Isaiah's ploughshares on the Memorial. In imagery such as Ohio's, the classical figure is Lady Columbia;

a related, predecessor figure to Lady Liberty. No one would mistake that her central purpose in

the medal, or of the veterans' medal itself, is to intimidatingly boast of Ohio's towering glories.

Moses Ezekiel did not become the most famous Jewish American sculptor in our nation's history

and "a great citizen of world fame," to quote President Harding's eulogy message, because of his

exceeding crassness.

37. The Commission's Final Report also states: "The monument's pedestal features 14 shields,

engraved with the coats of arms of the 11 Confederate states, plus Kentucky, Maryland and

Missouri. Although distinct minorities in those three states chose to support the Confederacy, the

substantial majority of their respective leadership and citizenry remained within – and in

overwhelming support of – the United States. The memorial's inclusion of the heraldry from

those states distorts history by inflating the Confederacy's size, support and significance." This

bizarre interpretation emerges once again through the erroneous assumption that the Memorial is

constructed in honor of the Confederate States of America, that it represents the C.S.A. itself.

The artist, officials, and citizens involved with the Memorial knew quite well which states had

and had not seceded from the Union, and no evidence is provided that they were trying to

"inflate" the "significance" of the Confederacy. Rather, similarly to the World War II Memorial

on the National Mall which contains pillars inscribed with the names of 56 U.S. states and

territories, and also includes wreaths, the state "heraldry" on the Confederate Memorial

represents where the Confederate soldiers whose deaths are being memorialized hailed from. To

give rough estimates: 25,000 Confederate soldiers hailed from Kentucky (per NPS); 20,000

Confederate soldiers hailed from Maryland (per Maryland State Archives) and 30,000 hailed

from Missouri (State Historical Society of Missouri). This explanation certainly satisfies

Occam's razor. Yet it undermines the Naming Commission and the Department of the Army's attempt to meet the criteria of SEC 370, and is supplanted by a more convoluted, bizarre, and villainizing explanation.

38. The act of mourning and of wartime death is totally absent from the Commission's description of the Memorial, beyond mention of the name "Arlington National Cemetery" and the interring of the remains in Section 16. For example there is no mention of the urns labeled with the years of the war, surrounded by fronds, just below the classical figure (they are of course mentioned in an even shorter description of the Memorial by a recent report from Evergreen Architectural Arts, a restoration contractor which was not attempting to comply with SEC 370 which did not yet exist). Yet these themes are significant in the historical record around the sculpture. Corporal James Tanner, National Commander of the Grand Army of the Republic and United States Commissioner of Pensions, a disabled veteran of the Civil War from New York for whom Arlington's Amphitheater was recently named, spoke at the cornerstone ceremony for the Confederate Memorial in 1912: "I recall as a I stand before you that just after the bill was introduced in Congress, setting aside this plot in which to inter the remains of the Confederate dead... [President McKinley] asked me what I thought of it. I answered him that he and I served and fought and that we did not make war upon dead men nor bear animosity toward them... wherever on this broad earth there exists a people who will encourage their manhood of any and all ages to go out and battle for a cause and then will permit those who gave their lives in sacrifice to that cause to lie in unmarked sepulchre and the memory of them die out, they are a people regarding whom I have no power of expression with which to convey to you the measure of scorn and contempt I feel therefor." These keywords and terms—"Confederate dead," "dead

men," "gave their lives," "sacrifice," "memory"—are simply absent from the present "analysis." Tanner, at the Memorial's cornerstone laying cemetery, contrasts that very ceremony with a hypothetical of veterans who "lie in unmarked sepulchre"—sepulchre being a stone structure where someone is buried—suggesting that the Memorial itself was seen by Tanner as a grave marking.

39. The Commission's Report, in a consistent pattern with the erasure of the themes of death, sacrifice, and loss, also does not mention the inscribed poem: "Not lured by ambition/Or goaded by necessity/But in simple/obedience to duty/as they understood it/these men suffered all/sacrificed all." The inclusion of this inscription very clearly points to the Memorial's function of memorializing dead soldiers who "sacrificed all"—their lives—in complete consistency with the hallowed nature of Arlington National Cemetery. Indeed, this inscription is relevant to the plaintiff's ancestor, a young man who was neither an officer nor an enslaver but a resident of Georgia who died in a war alongside hundreds of thousands of other men. This statement of relevance is not meant to excuse historical wrongs—it is meant to highlight the very real enormous loss of life that the Memorial memorializes. ANC's original and unrevised Phase II Intensive-Level Survey of the Confederate Memorial did not even include a photograph of the profile containing the inscription about sacrifice. This pattern of erasing elements of the Memorial from the evidentiary record that began with the Naming Commission and was repeated across different levels of the Department of Defense.

40. A failure to meet SEC 370 (c)(2) best explains the Commission's Army-supported failure to honestly describe and fairly interpret the physical features of the Memorial, as well as the Commission's Army-supported failure to follow SEC 370's plainly stated criteria for removal.

41. The 2022 Surveyor Assessment update by ANC staff (on DHR ID: 000-1235) within Army National Military Cemeteries, while perhaps making groundbreaking genre innovations through the inclusion of abstract political dogma in the genre of the archaeological survey report, contains fallacious relationships between evidence and assertion in line with the Naming Commission's failure to describe the Memorial using a developed and professional procedure. Once again, the empirically false master narrative cultivated up and down the hierarchy of the Department of Defense won the day. To quote that Architectural Survey: "The symbolism of Ezekiel's sculpture reinterpreted the Civil War and slavery in a manner consistent with late nineteenth- and early twentieth-century ideas about a "New South" that would be politically and economically integrated into a reunified nation. This project of so called national reunification, however, denied the horrors of slavery and compromised African American civil rights, as had been codified in the 13th, 14th, and 15th Amendments added to the Constitution after the Civil War." It continues: "The Arlington Confederate Memorial presented a highly sanitized representation of slavery, consistent with images of "faithful slaves" and "mammies" that appeared widely in American popular culture during this era. It promulgated false historical narratives about the Civil War and buttressed policies of segregation that aligned with the efforts of many white southerners and their supporters to maintain vestiges of the prewar racial hierarchy even after emancipation. Within the larger context of Civil War commemoration, Reconstruction, reconciliation, and the long struggle for African American civil rights, as well as

the surrounding landscape of ANC, this memorial represented an important example of how the

Lost Cause ideology was physically manifested in the built environment of the United States—in

ways that perpetuated this perspective into the present day." Beyond the reference to the two

sculpted figures of enslaved Black Americans on the Memorial, these sweeping claims make no

reference to the material content of the memorial. This continues with the claim: ""It [the

Memorial] promulgated false historical narratives about the Civil War and buttressed policies of

segregation that aligned with the efforts of many white southerners and their supporters to

maintain vestiges of the prewar racial hierarchy even after emancipation." This addition to the

Architectural Survey does not explain which false historical narratives about the Civil War were

"promulgated," it does not name the "policies of segregation" that the Memorial is said to

directly "buttress." It suggests no direct evidence, such as reference to an historical event at the

cemetery, that gives credence to the Memorial's role of "perpetuating" the "Lost Cause

ideology" "into the present day." The discourse produced by the Office of Army Cemeteries is

replete with far more ideological flourish and bluster than the Memorial itself. This Architectural

Survey update, a dramatic departure written during the Naming Commission process containing

enough hot air to qualify for entry in the Albuquerque International Balloon Fiesta, does not

meet a professional and scholarly standard and raises procedural and processual doubts.

42. The Office of Army Cemeteries has not responded to official public comments by the

plaintiff that have pointed out these errors in representation, and no one at the Department of

Defense has indicated any effort to elaborate upon, verify, or rectify the falsehoods contained in

the written descriptions of the memorial it continues to use as it proceeds with the removal.

Despite the unprecedented nature and gravity of removing this cemetery element, the Naming

Commission's "Official Historian" was a graduate student who has still not completed his PhD, who lacked topical or period specialization.

43. The plaintiff attempted to point out these many legal discrepancies and unsubstantiated historical interpretations during the public comment scoping process, and other public comment opportunities after scoping but before the draft EIS (when Army National Military Cemeteries appeared to trot out various sections of the coming EIS in piecemeal, such as regarding the Area of Potential Effects, with the effect of displaying a commitment to engagement with public comments while also tightly controlling the release of sub-topic-specific public comments only). The plaintiff, who attended and spoke at the August public comment meeting over Zoom during the scoping process about his concerns with the Naming Commission's authority to remove the Memorial, awaited the draft EIS and planned to read the Army's responses to concerns raised. The plaintiff preferred to participate in this process rather than file any complaints in court.

44. Then, while periodically checking in on ANC's Confederate Memorial Removal website on November 30th, the plaintiff learned of the Army's abrupt eleventh-hour shift from an EIS to an EA under NEPA, as announced with the signature of Karen Durham-Aguilera, Executive Director. In a pivot, the Army claimed there "would be no reasonably foreseeable significant impacts from any discretionary elements of the proposed action" and that the EIS process was only originally initiated as a matter of "public comity."

45. The Department of the Army's eleventh-hour claim that "There would be no reasonably foreseeable significant impacts from any discretionary elements of the proposed action" relies on

circular logic. Even if one accepts the Naming Commission's position of a full remit regarding

the Confederate Memorial in Arlington, the Commission's Report still details different possible

scenarios considered, makes no definition or recommendation regarding "disposal" beyond cost-

saving, and merely suggests the granite base be kept. The removal process, described by the

Naming Commission as the "disposal" of the Memorial, is explicitly discretionary and could

include alternatives with significant environmental impacts—such as the wholesale obliteration

of a major cultural resource once a feature of a National Historic District. Cultural resources are

not addressed through NHPA at the expense of NEPA; they are equally part of the NEPA

process.

46. Thus, again, if accepting the Naming Commission's remit, both the 1) decision to leave the

granite base on site and 2) decision to remove the Memorial to storage rather than destroy it or

remove it elsewhere, are "discretionary" rather than non-discretionary elements of the action.

47. The NEPA process is a decision-making process; an agency that has already begun the

Environmental Impact Statement process, narrows its decision considerably, then claims in an

about-face that an Environmental Impact Statement is no longer relevant because what is left to

be decided is so narrow, strikes at the heart of NEPA itself.

48. The ANMC's false narrowing of what is non-discretionary comes in part from reference to

another law. "Third, if the bronze elements of the memorial are removed and relocated, ANMC

recommends that they should be treated and maintained in accordance with the "Secretary of the

Interior's Standards for the Treatment of Historic Properties" (36 CFR Part 68, 1995). If

deconstructed, the pieces should be documented, inventoried, catalogued, and preserved for future study and future disposition, as determined through the Section 106 process and in consultation with the public and consulting parties" (page 32 of the Phase II Survey). However, those standards are guidance, and not legally compelled. The ANMC is indeed exercising more consequential discretion than its eleventh-hour shift to an EA claims.

49. The result is that this unprecedented removal of a major cultural resource at Arlington National Cemetery will have never undergone an Environmental Impact Assessment under NEPA. The non-discretionary buck is continually passed, all the way up to Congress, who were, as we were told thirty-six times in one speech, simply renaming bases. Thus the curtains at Oz are tightly drawn and the buck is nowhere to be seen. But is no one really at fault that there was never an EIS?

50. The action did not become non-discretionary for the Office of Army Cemeteries until the Secretary of Defense's Memorandum, "Implementation of the Naming Commission's recommendations" on October 6, 2022. After all, while Congress instructed the Secretary to implement the Commission's recommendations, that does not absolve the Secretary from verifying their legality before recommendation turns to order. The Commission could have elected to recommend the DoD destroy, rather than simply rename, the asset of Fort Bragg (now Fort Liberty); the Secretary could have challenged such a recommendation and not included it in his orders.

51. The Secretary's call in the October 6th Memorandum for the departments to create Plan of Actions and Milestones was an appropriate juncture, as per § 1501.2 "Apply NEPA early in the process: (a) Agencies should integrate the NEPA process with other planning and authorization processes at the earliest reasonable time." The failure to initiate NEPA at this stage, when the process was directed and planned under senior officials such as Secretary Austin and Secretary Wormuth, appears as a wholesale NEPA violation now that ANMC cries, "Non-discretionary action! No EIS needed!"

52. Thus the plaintiff, having waited for months to read the Draft EIS, in hopes that his concerns could be mollified or at least heard, determined that he must head to Court. The plaintiff, who cannot afford a lawyer, unsuccessfully pursued pro bono representation from various organizations and firms in Virginia and nationally, including the ACLU of Virginia and the New Civil Liberties Alliance, before resorting to representing himself.

In conclusion, the plaintiff claims that Lloyd Austin, in his official capacity as Secretary of Defense, and Admiral Michelle Howard, in her official capacity as Chair of the Naming Commission, have violated SEC 370 of the "William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021," and that Secretary Austin in his official capacity has directed Christine Wormuth, in her official capacity as Secretary of the Army, and Karen Durham-Aguilera, in her official capacity as Executive Director of the Office of Army Cemeteries, to violate same; that Lloyd Austin, in his official capacity as Secretary of Defense, Christine Wormuth, in her official capacity as Secretary of the Army, and Karen Durham-Aguilera, in her official capacity as Executive Director of the Office of Army Cemeteries, have

grossly violated NEPA; that all four defendants in their official capacities have violated the Fourteenth Amendment; and that Lloyd Austin, in his official capacity as Secretary of Defense, Christine Wormuth, in her official capacity as Secretary of the Army, and Karen Durham-Aguilera, in her official capacity as Executive Director of the Office of Army Cemeteries plan to imminently violate the First Amendment.

The plaintiff asks the Court to issue a preliminary injunction, temporary restraint, or any means to prevent the imminent removal of any element of the Confederate Memorial at Arlington National Cemetery until this complaint is resolved. The public interest in the fate of a Memorial that has stood for over 100 years in a hallowed National Historic District outweighs the benefits of any difference by a matter of months in the date of the Memorial's removal. The act of removing the Memorial, even if it were to be later returned to Arlington by Court order, would still result in a significant new precedent at Arlington, for cemeteries nationally, and for the plaintiff's great-great-great grandfather's grave marker; furthermore, there is a non-negligible chance of damage to the Memorial's bronze, as the Department of the Army has acknowledged.

The plaintiff also asks the Court to issue a permanent injunction against the Army and Department of Defense ordering that no element of the Confederate Memorial at Arlington National Cemetery be removed, and any other relief deemed necessary by the Court.

Dr. John Patrick Moran, PRO SE
6471 Bold Venture Trail

28

Tallahassee, FL, 32309
8505097857
moranjohnp@gmail.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
*Alexandria* DIVISION                    FILED

John P Moran
_____
Plaintiff(s),

v.

Civil Action Number: 1:23-cv-01681

Lloyd Austin et al.
_____
Defendant(s).

## LOCAL RULE 83.1(M) CERTIFICATION

**I declare under penalty of perjury that:**

**No attorney has prepared, or assisted in the preparation of** Complaint _____.
                                                              **(Title of Document)**

John Moran
_____
Name of *Pro Se* Party (Print or Type)

*[signature]*
_____
Signature of *Pro Se* Party

Executed on: 12/8/23 _____ (Date)

**OR**

**The following attorney(s) prepared or assisted me in preparation of** _____.
                                                                      **(Title of Document)**

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)